$400

BMS

JS 44 (Rev 06/17)

**CIVIL COVER SHEET** 19-cv-2408

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)*

## I. (a) PLAINTIFFS
Wandrea Russo

**DEFENDANTS** 19   2408
Bryn Mawr Bank Corporation d/b/a Bryn Mawr Trust Company

**(b)** County of Residence of First Listed Plaintiff   Delaware
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mark D Schwartz, 300 Sandcastle Drive, Bryn Mawr, PA 19010
610 525-5534

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

|  |  |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☒ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2   U.S. Government Defendant | ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers | Product Liability |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine ☐ 345 Marine Product Liability | Injury Product Liability **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark **SOCIAL SECURITY** | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence |  |  | Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General |  |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** |  |  |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other ☐ 448 Education | **Other:** ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
Title VII    1981
Brief description of cause:
Wrongful discharge in viol. of civil rights

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P
**DEMAND $**
>$150,000
CHECK YES only if demanded in complaint
**JURY DEMAND:** ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE _____   DOCKET NUMBER _____

DATE   June 4 2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG JUDGE

JUN - 4 2019

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**19     2408**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 105 Ardmore Ave, Upper Darby, PA 19082

Address of Defendant: 801 Lancaster Ave., Bryn Mawr, PA 19010

Place of Accident, Incident or Transaction: corporate locations of Defendant in Eastern Pa.

---

**RELATED CASE, IF ANY:**

Case Number _____  Judge _____  Date Terminated _____

Civil cases are deemed related when *Yes* is answered to any of the following questions

| | | | |
|---|---|---|---|
| 1 | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☒ |
| 2 | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☒ |
| 3 | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☒ |
| 4 | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☒ |

I certify that, to my knowledge, the within case ☐ is ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above

DATE: June 4, 2019

*Attorney at Law / Pro Se Plaintiff*

PA 30527
*Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a ✓ in one category only)**

**A.     Federal Question Cases:**

- ☐ 1  Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2  FELA
- ☐ 3  Jones Act-Personal Injury
- ☐ 4  Antitrust
- ☐ 5  Patent
- ☐ 6  Labor-Management Relations
- ☑ 7  Civil Rights
- ☐ 8  Habeas Corpus
- ☐ 9  Securities Act(s) Cases
- ☐ 10  Social Security Review Cases
- ☐ 11  All other Federal Question Cases
      *(Please specify)*

**B.     Diversity Jurisdiction Cases:**

- ☐ 1  Insurance Contract and Other Contracts
- ☐ 2  Airplane Personal Injury
- ☐ 3  Assault, Defamation
- ☐ 4  Marine Personal Injury
- ☐ 5  Motor Vehicle Personal Injury
- ☐ 6  Other Personal Injury *(Please specify)*
- ☐ 7  Products Liability
- ☐ 8  Products Liability – Asbestos
- ☐ 9  All other Diversity Cases
      *(Please specify)*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, Mark D. Schwartz , counsel of record or pro se plaintiff, do hereby certify

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs.
- ☐ Relief other than monetary damages is sought.

DATE: June 4, 2019

*Attorney at Law / Pro Se Plaintiff*

Pa 30527
*Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38

Civ 609 (5/2018)



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CASE MANAGEMENT TRACK DESIGNATION FORM

Wandrea Russo

: CIVIL ACTION

v.

Bryn Mawr Bank Corporation d/b/a Bryn Mawr Trust company

NO. **19    2408**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.       ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.       ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.       ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)       ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.       (✓)

June 4, 2019              Mark D Schwartz              Plaintiff
Date                     Attorney-at-law             Attorney for

610525-5534              610525-5534              Markschwartz6814 @
Telephone               FAX Number               E-Mail Address        gmail.com

(Civ. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WANDREA RUSSO | : | |
| 105 Ardmore Avenue | : | |
| Upper Darby, PA 19082 | : | **CIVIL ACTION** |
|                **Plaintiff** | : | |
| | : | **NO.** |
| | : | |
|       **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **BRYN MAWR BANK CORPORATION d/b/a** | : | |
| **BRYN MAWR TRUST COMPANY** | : | **COMPLAINT** |
| **801 Lancaster Avenue** | : | |
| **Bryn Mawr, PA 19010** | : | |
|            **Defendant** | : | |

## COMPLAINT

1.      Plaintiff Wandrea Russo, an African-American female, has been discriminated against on account of race and unfairly targeted, penalized and retaliated against as a result of raising claims of discrimination by her employer, Bryn Mawr Trust Company. She has been subjected to a racist and discriminatory atmosphere which pervades Bryn Mawr Trust Company, all of which is countenanced and supported by management.   After reporting the discrimination and filing a charge of discrimination with the EEOC, Ms. Russo continued to be harassed and retaliated against, with executives at the bank allowing patently spurious and unfounded allegations to be made against her which placed her in a false light. While the discrimination and retaliation were initially perpetrated by her direct boss, it has been continued by others right up until Plaintiff could handle the illegal and discriminatory environment no more. At all pertinent times the Board was aware of the situation and did nothing to rectify it. After it was clear that HR would not protect her, she was constructively discharged or about May 23, 2019 Ms. Russo now seeks to recover compensatory and punitive damages pursuant to 42 U.S.C. § 1981, Title

1

VII of the Civil Rights Act of 1964, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951 *et seq.* Additionally, Ms. Russo asserts a common law claims for intentional infliction of emotional distress and being placed in a false light.

## PARTIES

2.    Plaintiff Wandrea Russo ("Ms. Russo" or "Plaintiff") is an adult female born on July 20, 1975 who resides in the Commonwealth of Pennsylvania. Ms. Russo has been continuously employed by Defendant from 2014 to approximately May 23, 2019 with her last position as Head Teller at Defendant's main branch in Bryn Mawr, Pennsylvania. As an African-American female, she a member of a protected category of individuals under pertinent civil rights statutes.

3.    Defendant, Bryn Mawr Bank Corporation d/b/a Bryn Mawr Trust Company ("Defendant" or the "Bank") is a publically-traded commercial bank, headquartered at 801 Lancaster Avenue in Bryn Mawr, Pennsylvania. The Bank employs Ms. Russo and approximately 600 employees and is an employer as defined by Title VII and the PHRA.

4.    At all relevant times hereto, Defendant acted by and through its duly authorized actual and/or apparent agents and employees, including but not limited to Therese Trainer and Nicola Fryer, acting within the course and scope of their actual and/or apparent agency and employment.

## JURISDICTION AND VENUE

5.    This Court has federal question jurisdiction over the subject matter of Plaintiff's claims under federal law pursuant to 28 U.S.C. §1331.

6.       This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367, because the state claims and federal claims are so interrelated that they form part of the same case or controversy under Article III of the United States Constitution.

7.       Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391(b) and (c) since Plaintiff and Defendants reside in the Eastern District of Pennsylvania and the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Pennsylvania.

## FULFILLMENT OF TITLE VII CONDITIONS

8.       Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII and PHRA.  Plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRA") on or about April 29, 2018.

9.       The EEOC issued a Right to Sue letter to the Plaintiff on March 7, 2019 with respect to her initial charge and then again issued a Right to Sue letter with respect to her May 24, 2019 constructive discharge charge on May 30, 2019. This lawsuit has been timely filed as it has been brought within ninety (90) days of the issuance of the Right to Sue letters.

## ANTICIPATED ADDITION/JOINDER OF WHISTLEBLOWER CLAIMS

Plaintiff had to file this civil rights lawsuit within 90 days of receiving the Right to Sue letters.  In addition, pursuant to two federal statutes Plaintiff has asserted whistleblower complaints against Defendant with OSHA.  She has asserted claims pursuant to The Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1514A., specifically Section 806 thereof, which protects employees who report fraudulent activity that can harm investors in publicly traded companies. She has also invoked protection and asserted claims against Defendant pursuant to The

3

Consumer Financial Protection Act (Section 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C Section 5567), which protects employees who report reasonably perceived wrong-doing by employers that provide consumer financial products. Pursuant to these statutes Plaintiff's whistleblower complaint(s) had to first be filed with OSHA to followed by the expiration of 180 days prior to being able to proceed in Federal Court. As Plaintiff filed a complaint with OSHA on May 9, 2019, the requisite time has not run. At the requisite time Plaintiff expects to add those claims to her lawsuit.

## FACTUAL ASSERTIONS

10.     Therese Trainer is a Caucasian female who has served as Ms. Russo's direct supervisor in her capacity as the Bank's Bryn Mawr branch manager since 2015.

11.     With the acquiescence and support of senior management, Ms. Trainer regularly exhibited favoritism toward white employees even going so far as to excuse rule violations by them, including rule violations that required termination, suggesting in pertinent instances that a white employee would never steal money. For instance, a teller was caught forced balancing in February, 2018 and Ms. Grainer termed it an "honest mistake." When questions had previously been raised in September, 2017 about a white Villanova student working there, she dismissed concerns by saying that he would not have needed the money.

12.     Moreover, Ms. Trainer regularly permitted white employees, without reservation, to leave work when they pleased. Oftentimes given the dual control requirement, Ms. Trainer would often say that she was the second person to be involved and then was nowhere to be found. This blatantly discriminatory action necessitated extended work hours by Ms. Russo and other African Americans, denigrating them, and leaving Ms. Russo and other African-American

4

employees to stay at work later. In addition, Plaintiff and other African Americans were expected

to do tasks that were not expected of white employees and that were not at all within Plaintiff's

job responsibilities.  To add insult to injury, Ms. Russo and other hourly employees found that

their time was shorted as reflected in their paychecks. In addition, Ms. Trainer insisted that Ms.

Russo not leave the building during her lunch break as she required Plaintiff to be available when

new employees were training. Ms. Trainer also otherwise insisted that Plaintiff not change her

schedule and went so far as to tell her, notwithstanding that schedule, "Don't make plans!".

When Plaintiff was otherwise simply following procedures in April, 2018, Ms. Trainer said

"You're so nasty!" something that Plaintiff clearly is not.  Not known for any consistency other

than bigotry, Ms. Trainer changed course when it came to demands, saying "Wandrea, you need

to plan for the unknown. Don't you have a brain?"  She made this criticism a number of times,

lastly in approximately February of 2018.

   13.  Blatantly racist comments made directly to Plaintiff as well as other African

Americans, made known to the Defendant's Board, include the following:

> -During the 2016 presidential election season, Ms. Trainer talked about Donald
> Trump nearly every day to Plaintiff and others. At one point she added that "The problem
> with most blacks is that they don't understand how to budget" and that if they did "They
> would be Republicans." Ms. Russo responded by telling Ms. Trainer that she should not
> make such comments and that she is very good at budgeting, to which Ms. Trainer
> replied: "Yes, but that is very rare for your kind of people."

> -In June, 2016 when Ms. Trainer was completing a transaction at Plaintiff's teller
> window, an African-American security guard standing next to Plaintiff lamented, "I've
> been working like a Hebrew slave!" Ms. Trainer told Plaintiff "I'm so tired of black
> people complaining about slavery. Irish Slaves were treated far worse than any of the
> Black slaves were ever treated. They actually forced the Irish slave women to sleep with
> the black slaves to create a stronger slave. Blacks need to just get over it and stop acting
> like victims." When Plaintiff told her that she was not going to engage in a debate with
> her about whether African slaves were treated poorly. Ms. Trainer said "It's time, you
> need to educate yourself and study history."

-In June, 2017, Ms. Trainer, in the presence of Ms. Russo, asked another African-American teller, Richard Rose, to retrieve an item from the bank's vault. As Mr. Rose began to walk in the direction of the vault, Ms. Trainer said: "Rich, you are a Jamaican right? Jamaicans are supposed to be fast. Run! Run Rich!" Based on racial issues he had experienced with Ms. Trainer; Mr. Rose requested and received a transfer. Whenever his name was mentioned, Ms. Trainer would say "I have no respect for him. He is not a man."

- In March 2017, during working hours and at the workplace, Ms. Trainer approached Ms. Russo suggesting that she attend a pro-life (anti-abortion) meeting because according to Ms. Trainer, "most aborted babies are from black mothers."

-One day in March, 2017 Ms. Russo was having difficulty with a rude and verbally abusive customer who stuck a finger in Plaintiff's face and had no patience with Plaintiff's simple request for help with that customer's very heavy safe deposit box. Ms. Russo told Ms. Trainer that she did not feel safe assisting the customer, to which Ms. Trainer replied: "She is a little old white lady, and you are a big black woman. I'm sure she is more scared of you than you are of her."

-In one of a number of instances, Plaintiff emailed Ms. Trainer and HR regarding schedule adjustments. Plaintiff had been shorted pay for worked hours. Ms. Trainer walked over to her teller window and said "Why are you so desperate Wandrea? Don't you have any money?" Further, Ms. Trainer made it a practice to not allow Plaintiff to punch in or punch out for herself with the result that in many instances Plaintiff was working off the clock

14.     Ms. Trainer continuously and repeatedly harassed and offended Ms. Russo,

including calling her a liar, questioning whether Ms. Russo had a brain, suggesting that she and

another African-American employees were stealing pens from the Bank in February of 2018 and

placing them in their purses, even suggesting that Ms. Russo could not  afford to buy a purse,

asking what kind of tote bag Plaintiff was carrying. When Plaintiff told her that it was made by

Dooney and Burke, Ms. Trainer said "And how can you afford that?" Continuously adding insult

to injury, Ms. Trainer told Ms. Russo and other African-American employees that they should

buy their work clothes at the thrift shop. Furthermore, Ms. Trainer purposely placed Plaintiff in

compromising and awkward confrontations with other bank employees. She repeatedly criticized

Plaintiff for "not being a team player" as recently as March, 2018.

15.     Obvious disparate treatment included the fact that Plaintiff was forced to process credit card referrals by herself, when other Caucasians had their referrals processed by other platform employees. Moreover, credit for her new business origination was instead directed to white employees. One such incident occurred in March, 2018. When Plaintiff called Regional Manager Laura Biernacki to protest Mr. Trainer's decision to give a white employee credit for her origination, Ms. Biernacki's response was to tell Plaintiff to stop calling her, that Ms. Trainer's decision was final, and would stand.

16.     In a  March, 2018 scene reminiscent of racial stereotypes in the movie "Driving Miss Daisy", starring Jessica Tandy and Morgan Freeman as her African-American chauffeur, Plaintiff recalled a situation, also in March 2018, where she was forced, over her objection, to transport a white teller and the bank's rolled currency between branches in her own personal vehicle. Plaintiff's protests included concerns over safety and personal liability due to the use of her personal vehicle, instead of Bank practice utilizing Bank security personnel. Despite Plaintiff's valid concerns, Ms. Trainer's response was "You have to do it! That's It. "

17.     Typical of other instances was a mid-April, 2018 incident where Ms. Trainer argued with Plaintiff in front of other employees and customers about the posting of a client's fees to his or her account. Despite the fact that Plaintiff explained that she had gone over the new procedure for processing this fee with all of the tellers, Ms. Trainer continued to yell at Plaintiff to the point of calling Plaintiff a liar.

18.     Despite prior instructions from Ms. Trainer that Plaintiff not go over her head to Ms. Laura Biernacki in February, 2018, Plaintiff reported the harassment against her to the Bank's Human Relations Department and the regional manager, Laura Biernacki. A meeting ensued in late April, 2018 with Ms. Biernacki and HR employee, Nicola Fryer. Not only did

7

Plaintiff the "fee" incident but the above-referenced incidents, including the slavery comment. Instead of suggesting that Ms. Trainer be removed, HR's focus was on Plaintiff with Ms. Biernacki asking Plaintiff where she wanted to move away from the situation. Plaintiff's requested that she stay in her current position and current location explaining that she "just wanted to do her job without being harassed." Ms. Biernacki then sought to justify and excuse Ms. Trainer's abhorrent behavior by referring to the Bank's ever-present pressure for new business and noting that the branch was not doing well in 2017.  She stated further that "Therese is probably scared for her job" Never mind the fact that Ms. Trainer, sometimes daily, but then as recently as February, 2018 had threatened Plaintiff's job, portending "Very Bad Consequences" and saying "Remember you need to get a sale today or it will be very bad for you." All the while Ms. Trainer denied any responsibility for her own menacing behavior. Instead she said "It's not me, its Laura" when it came to the origin of that self-same pressure. Finally, Ms. Biernacki characterized Ms. Trainer's abhorrent behavior as simply being "blunt.".

19.     Plaintiff's situation only proved to get worse as Ms. Trainer began to further retaliate against Ms. Russo for having reported the incidents to HR while Ms. Biernacki continued  her efforts to get Plaintiff out of her current job, suggesting that Plaintiff become a Universal Banker, a position which is considered by management to be the step just prior to being pushed out the door. The retaliation against Plaintiff escalated with a situation on April 26, 2018 when Ms. Grainer had her assistant manager text Ms. Russo to come in to meet with her later. When Plaintiff later said that she had not seen the text, Ms. Trainer called her a liar.

20.     Moreover, the harassment and discriminatory working environment were anything but something solely attributable to Ms. Trainer. Plaintiff recalls her presence in a

meeting with Senior management, where not one person would acknowledge, let alone speak to Plaintiff or another African-American teller. This was symptomatic of the racist environment that pervades the Bank.

21      The culmination of Plaintiff's workplace stress and the discrimination she experienced came on April 25, 2018 directly after the HR meeting.  Plaintiff came to experience chest pains. Fearing that she was having a heart attack, she left work for the Emergency Room of Bryn Mawr Hospital. Not surprisingly, this was all the result of the hostile, stressful environment, and harassment that the Bank forced Plaintiff to endure.

22.     On or about April 29,2018, Plaintiff dual-filed her Charge of Discrimination with the EEOC and the Pa Human Relations Commission, after experiencing months of intense harassment.

23.     After a short period of recovery beginning with her departure from the hospital on April 25, 2018, Plaintiff returned to work on May 1, 2018.  The retaliation continued in short order, as she was then charged with a security violation involving a set of keys. Plaintiff proceeded to explain the situation.

24.     Plaintiff's undersigned counsel, Mark D. Schwartz, wrote a letter to Board Chair Britton H. Murdoch dated May 16, 2018 (returned for non-delivery and subsequently resent) detailing not only the disgusting discriminatory environment that Plaintiff faced, but the extent of the retaliation which continues to this day. The first paragraph contains the following:

> …..Ms. Russo has sought relief from HR with no relief being provided. As a result, we filed a Charge with the EEOC. Notwithstanding the report to HR and the filing of the charge, Ms. Russo continues to be harassed and retaliated against, the latest incident today which consisted of BMTC's making of spurious and un founded allegations against her. This will prove to be another tactic of the Leto administration designed to discredit her and remove her from her job. It is a desperate tactic which will simply create more liability for the bank.

25.     Despite sending Mr. Murdoch an email confirming that since Plaintiff's counsel's letter was sent, "the retaliation against Plaintiff has increased". Notwithstanding, nothing in the way of a response was ever received.

26.     On May 25, 2018, Plaintiff arrived at work at her scheduled time. When she sat down at her desk, Regional Manager Laura Biernacki came over to her and instructed Plaintiff to meet with her in the conference room. HR Representative Nicola Fryer was already present in the conference room. They wanted to know if Plaintiff had anything to add to her previous explanation of the alleged security breach of an unsecured key box. They said that the condition of the Key Box and its security were solely Plaintiff's responsibility. Plaintiff countered that the box was never in an unsecured condition under her watch, and that whatever happened occurred when she was out sick.  Therefore, it could not have been her responsibility. Part of Plaintiff's recitation came to involve Ms. Trainer entered the situation. There had been a discussion between the two of them over the fact that one teller was in possession of another's keys and that this was against security procedures. Ms. Trainer countermanded Plaintiff saying, "No, it's fine, just get her up and running." It was clear to Plaintiff, later validated by a witness, that this was another attempted setup of Plaintiff. Plaintiff walked Ms. Biernacki and Fryer through the events of the morning in question, proving that she was not the one who gave the teller in question the set of keys, as she was already working in a different wing of the bank and that they were free to check available video if they so wished. Those at the meeting ignored Plaintiff's explanation and suggestions, with Ms. Biernacki changing the subject and accusing Plaintiff of being unwilling to accept all of her responsibilities as Head Teller and charging Plaintiff with being unorganized.

27.     In fact, when Plaintiff was first hired, the entire concept of "Key Control" and a "Key Box" was non-existent. It was Plaintiff who set up the Key Control system in the first

place. Ms. Biernacki and Ms. Fryer made a point of explicitly and disingenuously denying that

Plaintiff's harassment report had nothing to do with this investigation. They then ordered

Plaintiff to leave the branch immediately to allow them to finish their investigation. Plaintiff then

proceeded to walk over behind the teller line to sign out on the time clock. In plain view and

hearing of other employees and customers, Ms. Fryer then stated that Plaintiff was no longer

allowed behind the teller line. She demanded Plaintiff's keys and stated that Plaintiff was on

administrative leave until further notice. Plaintiff felt publicly humiliated. Again, upon

information and belief, this alleged security breach was something entirely fabricated by Ms.

Trainer and HR could have easily learned this if it simply chose to do so. As it turned out

Plaintiff would not be able to return to work for almost a month, on June 21, 2018. Fellow Bank

employees were left to wonder where Plaintiff was and whether she had done something wrong

or even criminal.

28.     On June 4, 2018, while still on leave Plaintiff received a telephone call from Ms.

Fryer and Ms. Stryker of HR who said that they were still conducting their investigation.

However, it was not the investigation of the security matter that precipitated Plaintiff's being

removed from her job and sent home. The call started off with their asking Plaintiff if there were

other discrimination incidents that Plaintiff could recall other than the thirty or so incidents in

Plaintiff's counsel's letter to the Board Chair. They also asked Plaintiff's claims of having her

pay shorted.  Plaintiff told them that it was a regular occurrence to be asked to start working

without signing in.  Management would always ask an employee to start actual work before his

or her shift and then assure the employee that his or her time would be "fixed". Of course, the

time was never "fixed."   Ms. Fryer had been well aware of fraudulent practices with respect to

11

time employed by the Bank.  Just one example of Ms. Trainer's tinkering with time is

memorialized in an email to Plaintiff dated May 5, 2016:

> Hi Wandrea,
>
> Looks like you and Kristen are headed toward overtime. One (you preferably since I have to add hours to your time) of you must leave tomorrow-if you think both of you can please do that. We have to adjust earlier in the week if you see that we are headed for O/T as is the case now. It's difficult to make adjustments with only 1.5 days left. Steve (Novak) has said ZERO overtime. We MUST adhere to that.
>
> I trust you understand what our responsibility is as part of the Management Team. We can talk tomorrow if need be.
>
> Thanks, Wandrea..
>
> Therese G. Trainer
> Vice President/Branch Manager

Although they requested specific dates of wage shorting, then asked Plaintiff for specific dates,

Plaintiff said that there were too many incidents to recall. Ms. Fryer and Stryker, then claimed

that they would be looking into everything because they were "unaware of some of these issues

until now." They concluded the call in a typically insensitive and saccharine manner saying that

they hoped Plaintiff would have a good day.

29.    On June 13, 2019 Plaintiff wrote to Jennifer Stryker, head of HR informing her

that Plaintiff had learned that the federal Fair Labor Standards Act requires employers to keep

records on wages, hours, and other items. Plaintiff reminded her of their previous conversation

concerning Plaintiff's being shorted her pay. Further Plaintiff requested certain information that

must be provided to any employee pursuant to the Fair Labor Standards Act. Such information

was not forthcoming. Besides, the Bank would have to do individual interviews of management

who required off the clock work as the Bank's time records would not memorialize early sign-

outs and other time manipulation practices, which required Plaintiff and others to work off the clock.

30.     On June 20, 2018, Plaintiff again met with HR representatives Nicola Fryer and Jennifer Stryker. Ms. Stryker said that "after many conversations with employees",  although there may be a need for training regarding "how we as a bank engage with our employees and management being more aware as to how certain statements may be perceived," that they had made the determination that there was no evidence of harassment or discrimination. This was clearly a mixed message if there ever was one.  Then they switched topics to the accusations made against Plaintiff, again senselessly speaking in tongues. Ms. Stryker said that the investigation's conclusions discovered branch violations. Plaintiff then spoke up "So you did not find that I had done something wrong?" The response was that the "branch" had been found in violation of certain procedures, begging the question altogether, at the same time making it clear that it wasn't specifically Plaintiff. Ms. Fryer then asked Plaintiff how she felt about returning to work at her position. Plaintiff's response was that she would be ok provided she could work at her job without being harassed or retaliated against. Plaintiff added that, going forward, she would need to have her concerns not only heard, but responded to. Ms. Stryker asked Plaintiff if she had any additional concerns that they should be aware of. Plaintiff told them that based on the way this investigation proceeded, and how she had been publicly shamed and made to look guilty of something, she wanted to know what they planned to tell co-workers so as to reverse their negative impressions.  Plaintiff said that she knew that they would have questions and she wanted to know how they planned to address those questions. Stryker and Fryer sidestepped Plaintiff's questions altogether, instead commenting about how excited Plaintiff's co-workers were all excited about her return, at the same time preposterously stating that HR never used her

13

name during the investigation. This did nothing to rectify the fact that other workers knew full well that she had been removed from her job and that there was an investigation of her.

31.     Then the meeting turned to the subject of pressure sales tactics complained of by Plaintiff, with HR admitting that there were "gray areas causing problems" and that going forward they were going to rework the process to avoid these "gray areas".

32.     The meeting neared an end on an ominous accusatory note, further demonstrating Bank management's continued retaliation and harassment of Plaintiff, and singling her out as opposed to focusing on others  Ms. Stryker made it a point of informing Plaintiff that she had noticed that Plaintiff had sent multiple emails to her home address when that the information was confidential  and that Plaintiff should never forward any bank email to her home email address. Plaintiff responded that she was unaware that the information was confidential as she herself had been given access to it. Ms. Fryer declared that every email is bank property. The meeting ended with Plaintiff being instructed to report to her branch the next day, which was Thursday, June 21, 2018. Placed on leave for no valid reason on May 26, 2018, Plaintiff was cleared from a bogus investigation(s) to return almost a month later, complete with the attendant stigma.

33.     At that  meeting with HR on June 20, 2018 Plaintiff  was handed an envelope containing a  memorandum from BMT Human Resources dated June 20, 2018 regarding "Outcome of Internal Investigation" reciting that  it was in response to "matters that you brought to our attention in late April, 2018, and then further investigated the additional claims you raised when we received the letter from your attorney in late May, 2018, which specified additional incidents and more details of the matters initially presented.  Therein, the Bank made the backhanded statement that "we have not concluded that discrimination or harassment occurred", a statement raising more questions that it answered. At the same time HR obviously felt that it

14

had to indicate that it was doing something, telling Plaintiff that "for reasons of confidentiality

we cannot tell you all of the steps that we will be taking but some include; reminding all

employees about the anti-harassment policies of the Bank and providing additional training

managers and employees." Cutting through the verbiage and the Bank's parroting the language

of its clearly unenforced anti-discrimination policy, it was clear to Plaintiff that the Bank would

do nothing.

34.     On Friday, June 22, 2018, one day after her return to work, Plaintiff was

summoned to see HR head Jennifer Stryker who said to Plaintiff "When I checked on you

yesterday you said you were glad to back at work.  Is that true?"  Plaintiff agreed that she was

glad to be back at work. Then Ms. Stryker got to her point: "Are you aware we have been

contacted by a reporter regarding an article that will be printing in the DELCO Times?" Plaintiff

said that she was not aware of this. Ms. Stryker patronizingly continued, "Well, Wandrea, after

our meeting on Wednesday, I thought you were someone who valued your privacy and wouldn't

want your name smeared all over the papers." Clearly Plaintiff had not expressed this concern.

Ms. Stryker was plainly threatening Plaintiff over Ms. Stryker's concern that the Bank's

practices might be smeared all over the paper.  Ms. Stryker "suggested" that Plaintiff call the

reporter and tell him not to proceed with the story. She warned Plaintiff to "be careful about

going down this road" because once Plaintiff chose to do so, "there was no turning back."

Plaintiff then promptly learned that the newspaper had been lied to by a representative of the

Bank suggesting that that Plaintiff was upset and crying over the article. This was simply not the

case.  That following Sunday co-workers contacted Plaintiff telling her that they had received a

text announcing that a meeting was suddenly scheduled for Monday morning before opening.

Despite the fact that Plaintiff was scheduled to open, another person was asked to so by

management. Plaintiff was not included in any of these group texts that management sent to the other branch employees.

35.    As it became clear to other employees at the Bank what Plaintiff had gone through, Plaintiff was contacted by Alicia McDaniel, another African- American Bank employee at another branch who related her own discrimination and retaliation directed by Ms. Trainer and Ms. Laura Biernacki, all corroborating Plaintiff's contentions of discrimination and an illegal and hostile working environment.

36.    Plaintiff's Main Branch co-worker, teller Karen Stevens, a Caucasian female, was also retaliated against for corroborating what had transpired with respect to Plaintiff and what Plaintiff had complained of.  As a result, Ms. Stevens was told that she would need to work additional hours and begin training to take on additional duties.  These demands were made despite the fact that Ms. Stevens' sister had just died and that she was responsible for the care of her chronically ill mother. Management further retaliated by giving Ms. Stevens a write-up criticizing her for purportedly refusing to meet the requirements of her job.

37.    Additional fallout from Plaintiff's complaints and retaliation against those who supported her included the Bank's deliberate decision to "shuffle the deck"; i.e., moving various managers and other employees from their current location so as to cover up the fact that the Bank was transferring Ms. Trainer to a different branch in July, 2018.  So much for the Bank's empty statement that it could not determine that there was discrimination or a hostile workplace at the Main branch. Clearly, Ms. Trainer was not being moved to Ardmore, for no reason whatsoever. Moreover, in the last two weeks of July, 2018 management fired two other main branch employees who were in a position to further validate Plaintiff's contentions. Plaintiff and the remaining main branch staff felt as if they were in a bad episode of the television program

16

"Survivor." While Plaintiff was relieved that Ms. Trainer was gone, Plaintiff contended then and now that the entire system was long broken and that swapping out one racist manager was insufficient to rectify the hostile working environment.

38.     Despite Ms. Trainer's removal from Plaintiff's immediate workplace, Management's retaliation continued unabated.  On August 6, 2018, Plaintiff was scheduled to open the branch with another employee who didn't arrive at the scheduled time. Accordingly, Plaintiff looked at her emergency contacts list as since it took two qualified employees to open, she needed another person. Teller Shakeena Wilson got there and the two of them went to open the two cash vaults, which hold overnight all of the tellers' drawers. To their surprise while both vault doors were closed, they had been left unlocked.  When they then moved on to the night deposit vault, they found that it had not been secured either. Plaintiff found it indeed strange that her new manager, Ms. Cindy Yovanov was unconcerned about these clear violations of procedure. Plaintiff again felt that she was being set up.

39.     The next day Plaintiff was questioned about a teller being over $100 and stated that she had followed procedure with respect to this matter. Plaintiff's superiors clearly did not want to follow procedure and Plaintiff stated that she did not feel comfortable with not following them, given the fact that she was the one who had been previously suspended over alleged procedure violations. Plaintiff was pressed on this until she was nearly at the point of tears, telling Ms. Yovanov that she was being unfairly attacked just for doing her job.  Plaintiff said, "I don't know what you have heard about my situation here at the bank but I am not stupid and I just want to do my job." Further, Plaintiff told her manager that she was offended by Ms. Biernacki constantly implying that Plaintiff was a liar when Ms. Biernacki knew the procedural

requirements full well. It was clear to Plaintiff that there were some new players, but the game was the same.

40.    Undaunted, the Bank's continued its efforts to remove Plaintiff from her position to that of Universal Banker, a job she had previously had. Again, Plaintiff regarded that as a move to being pushed out the door. On Friday, February 1, 2019, Ms. Russo's manager, Cindy Yovanov, told another teller, Shakeena Wilson, in Ms. Russo's presence, that Ms. Russo would be moving to a new position as Universal Banker, and that the only thing keeping Ms. Wilson from the head teller job (Plaintiff's job), was her lack of sales referrals.  This comment took Plaintiff by complete surprise, placing her in an awkward position. Plaintiff mistakenly thought that this issue had been previously dealt with as she had previously made it clear that she was not interested in the Universal Banker job. In a long email of protest dated February 8, 2019, Plaintiff said "I'm glad that you are pleased with my performance. This is why I wonder why you are so eager to see me transition to something/somewhere else.  Again, Plaintiff felt that she was purposely being put in a stressful situation to cause her to make mistakes or simply quit altogether.

41.    The discrimination, illegal working environment and retaliation continued prompting Plaintiff to again write HR on March 5, 2019, reminding them of the April, 2018 meeting she had with HR and Ms. Biernacki. This time she emphasized that the she had previously complained about the escalating nastiness of Ms. Trainer threatening her job over the lack of sales and stating that the sales pressure was at the direction of Laura Biernacki. Plaintiff reminded HR that she had requested a meeting with Ms. Biernacki. Fast forwarding a year later, Plaintiff told HR:

Based on this history, and the current culture at the bank regarding its selling program, I want to again go on record as protesting these high-pressure sales practices.

The monitoring of new sales is relentless, and the pressure to obtain new sales is not in the best interest of the bank, it's shareholders, it's employees, or its customers.

Employees should not be pressured to fulfill a quota, to the point that their success or failure at the bank depends on it.

The manner in which it is conducted has had, and promises to further bring about fraudulent actions where customers do not in fact consent to obtaining these products, all as a result of senior management's no stop pressure to sell, sell, sell.

It is my understanding that BMT's practices are the very same that led to government action against Well Fargo.

I just want to go on record formally at this point.

Thank you,
Wandrea Russo

42.     Written with truly empty rhetoric, Plaintiff received a response of March 7, 2019 from Nicola Fryer of HR parroting the Bank's Code of Ethics and asking Plaintiff to provide specifics of misconduct.  However, Bank management knew full well of past history of patently fraudulent sales conduct by an employee highly touted for his sales, herein referred to as "K".  K was one of Stephen Novak's pets. Novak told assembled employees that K turned a branch around and could get things done, without excuses. K would give advice on salesmanship exhorting others about "not taking no for an answer." Plaintiff thought this was patent nonsense. K was even featured in the Bank's "Teamtalk" an internal Bank newsletter. Plaintiff knew full well that this employee's branch could not possibly generate these sales numbers. Eventually the Bank eventually let him go. The word circulated that he had been fired for opening accounts without customer consent. The rumor was that he was caught because some customers complained about getting credit cards that they had never applied for. At the time, employees could complete credit applications through an online site. After K's departure, procedures were

19

changed. HR wrote Plaintiff, "As to your comment that there is sales pressure- yes, we are a

business and absent sales, we would not exist. But in no instance would we ever expect to

pressure our employees to engage in fraudulent activity." Quite to the contrary, it is Plaintiff's

and others positions that the kind of relentless pressure applied to Plaintiff and others explicitly

leads to fraudulent activity and that senior management knew this full well.

43.     The discrimination and retaliation then continued unabated. On May 22, 2019,

Plaintiff was working at the Drive-Through window when a customer drove up to cash a check.

The customer started talking about the election and specifically, abortions. Plaintiff told her that

she was not comfortable with this conversation but the customer continued on unabated telling

Plaintiff about "black aborted babies" and "racial genocide." Despite Plaintiff's protests she

continued with additional comments that Plaintiff needed to wear a cross and should pray more

for the country and "your people" and follow the examples of Martin Luther King and Harriett

Tubman. Plaintiff repeatedly implored her to just take her transaction and told her that the

conversation was over. This was not the first time that this client had been inappropriate and

racist in her comments. Plaintiff related this promptly to HR relating what took place and

concluding:

> To be clear, I am offended.
>
> I will no longer allow anyone, customer or not to speak to me any way they wish.
>
> I have reported issues of racist comments to you before only to be told it would be addressed. I would like to know how you will be handling this.
>
> These issues are becoming too much and I am unsure how long I can continue to deal with it. Honestly, I should not have to deal with it.

44.     Plaintiff met with HR. Personnel were testing Plaintiff, asking her to relate what

happened in her own words. Plaintiff responded by saying that her email was clear. Nonetheless,

20

Plaintiff had to tell them again, adding that she had previously gone to her former manager about this particular client and that nothing had happened. Plaintiff wanted HR with her present to call the client. They refused. Again, HR spoke about the need to "investigate" despite the fact that all previous investigations produced nothing in the way of better behavior. That evening Plaintiff experienced a severe headache and symptoms reminiscent of what drove her to go to the hospital emergency room.

45.     When Plaintiff returned on May 23, it was made clear to her that despite HR's finding that what Plaintiff had told them was true, that no steps would be taken to protect Plaintiff from this client physically or emotionally. Plaintiff has never understood why it was her burden to tell HR and management to prove that she was telling the truth.  Although the client was spoken to by HR., Plaintiff was told that it would take a month for the Bank to terminate her as a client.  Moreover, the client was clearly not told to stay away from Plaintiff or told to do her banking at another branch. Rather, HR told Plaintiff that she might return to apologize. This simply proved to me more in the way of torment. Clearly HR was continuing the hostile environment which facilitates discrimination and Plaintiff, fearing for her safety had no choice but to quit from her employment, which she did that day. Her action can only be characterized as being "constructive discharge" given Defendant's unwillingness to enforce the law and promote her legal rights. Objectively, any similarly situated individual, would have done the same thing. Plaintiff subsequently filed her second charge with the EEOC on May 24, 2019 and has received a second "Right to Sue" letter.

## COUNT I
## VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

46.     Plaintiff restates and realleges all previous paragraphs as though fully set forth herein.

47.    Defendant has discriminated against Ms. Russo by denying her the same rights as are enjoyed by white employees with respect to performance, terms, location, conditions, benefits, privileges, promotion, discipline and emoluments of their employment relationship with the Bank, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

48.    Defendant's conduct has been intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

49.    By reason of the continuous nature of Defendant's discriminatory conduct, persistent throughout Plaintiff's employment with Defendant, she is entitled to application of the continuing violation doctrine to all of the violations alleged herein.

50.    By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available under § 1981, including but not limited to damages for mental anguish and emotional distress, reasonable attorney fees and costs, as well as punitive damages.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant and requests an award of damages including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

### COUNT II

**RACIAL DISCRIMINATION, RETALIATION AND MAINTENANCE OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq***

51.    Plaintiff restates and realleges all previous paragraphs as though fully set forth herein.

52.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq.* as amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful for employers to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race.

53.     Discrimination on the basis of race that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under Title VII as racial discrimination. In order to establish a hostile work environment, five factual elements must be established: (1) that the employee suffered intentional discrimination because of his or her race; (2) that the discrimination detrimentally affected him or her; (3) that the discrimination was pervasive and regular; (4) that the discrimination would detrimentally affect a reasonable person in the same position as the employee; and (5) that respondeat superior liability exists. In the totality of circumstances, the foregoing five elements are established.

54.     Defendant retaliated against Plaintiff as a result of her complaints of discriminatory treatment and a hostile work environment.

55.     Defendant is liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the actions and statements of its managers and employees.

56.     Defendant is liable for the acts of management and Plaintiff's co-workers, because it knew of the existence of a discriminatory and a hostile work environment, but allowed the illegal acts and practices to continue.

57.     Defendant is liable for the acts alleged herein because of its culture of encouraging racial discrimination, harassment and retaliation.

58.     Based upon the foregoing facts, Defendant has discriminated against Plaintiff on the basis of her race and retaliated against her for standing up for herself, in deprivation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq. as amended.*

23

59.     Defendant unlawfully retaliated against Plaintiff for filing charges with the EEOC and the Pennsylvania Human Relations Commission.

60.     The described unlawful employment practices by Defendant were intentional, deliberate, willful and were with malice or reckless indifference to Plaintiff's rights protected by the laws of the United States, as well as the laws of the Commonwealth of Pennsylvania.

61.     By reason of Defendant's discrimination, retaliation and maintenance of a hostile work environment, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant and requests an award of damages including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT III

### RACIAL DISCRIMINATION, RETALIATION AND MAINTENANCE OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT

62.     Plaintiff restates and realleges all previous paragraphs as though fully set forth herein.

63.     This claim arises under the Pennsylvania Human Relations Act ("PHRA"). The Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.*, makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race.

64.     Plaintiff, as an African-american in a protected class because of her race.

24

65.     Based upon the foregoing facts, Defendant has discriminated against Plaintiff on the basis of her race and has deprived her of her rights in violation of the Pennsylvania Human Relations Act, 43 P.S. § 955 *et. seq.*

66.     The effect of the aforementioned practices has been to deprive Plaintiff of equal employment opportunities and adversely affect her status as an employee because of her race.

67.     Racial discrimination that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under the Pennsylvania Human Relations Act as race discrimination.

68.     With respect to allegations of discrimination and retaliation, Defendant is liable for the acts of its supervisory and management employees, because the harassers and those who effectuated the discrimination used their actual or apparent authority to further the unlawful conduct, and were otherwise aided in accomplishing the unlawful conduct by the existence of an agency relationship.

69.     Defendant is liable for the acts alleged herein because its managers and supervisors established its corporate culture which encouraged racial discrimination as well as a hostile work environment.

70.     The described unlawful employment practices and actions by Defendant were intentional and were done with malice or reckless indifference to Plaintiff's rights protected by the laws of the Commonwealth of Pennsylvania.  These unlawful acts were committed because of her race and the fact that she stood up for herself in opposition to illegal practices directed against her.

71.     By reason of Defendant's discrimination, retaliation and maintenance of a hostile work environment, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant and requests an award of damages including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

72.     Plaintiff restates and realleges all previous paragraphs as though fully set forth herein.

73.     Defendants acted recklessly or intentionally by discriminating and retaliating against Plaintiff.

74.     Defendant's conduct exhibited toward Plaintiff was extreme and outrageous.

75.     As a direct and proximate result of the extreme and outrageous conduct of Defendants as set forth above, Plaintiff has suffered severe emotional distress and has required medical treatment in connection with her severe emotional distress.

76.     The extreme and outrageous conduct of Defendants, as set forth above, which was committed with a reckless indifference to the rights of Plaintiff, warrant the imposition of punitive damages.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant and requests an award of damages including, but not limited to compensatory damages, punitive damages, reasonable attorneys' fees and costs, and other relief as this court deems appropriate.

## JURY DEMAND

The Plaintiff demands a trial by jury of eight on all issues triable by a jury.

26

## CERTIFICATION

I hereby certify that Plaintiff has not brought a similar or related lawsuit encompassing the claims brought in this matter.

Respectfully Submitted,

**MARK D. SCHWARTZ, ESQUIRE**

By: /s/Mark D. Schwartz
Mark D. Schwartz, Esquire (Pa ID #30527)
300 Sandcastle Drive
BRYN MAWR, PA 19010
Telephone & Fax 610 525-5534
Markschwartz6814@gmail.com

**THE PEARLMAN LAW FIRM, PLLC**

By: /s/ Jason L. Pearlman
Jason L. Pearlman, Esquire (Pa ID #93879)
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004
610-660-7793
jpearlman@pearlmanlawfirm.com

DATED: June 4, 2019

*Attorneys for Plaintiff Wandrea Russo*

## VERIFICATION

I, Wandrea Russo, do hereby certify that I am the Plaintiff in the within action, and that the facts contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I do further understand that these statements are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

Wandrea Russo

Dated: