**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WANDREA RUSSO,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE BRYN MAWR TRUST COMPANY,** | : | **No. 19-2408** |
| **Defendant.** | : | |

**MEMORANDUM**

**Schiller, J.**                                                **October 27, 2022**

Plaintiff Wandrea Russo worked for Defendant The Bryn Mawr Trust Company (the "Bank") from 2014 until May 23, 2019. She alleges her former supervisor, Therese Trainer, made numerous inappropriate and racist comments and regularly harassed and offended her throughout her tenure at the Bank. Russo claims she was discriminated against when the Bank placed her on administrative leave following an investigation into a breach of security protocol. She also maintains that, after a customer made inappropriate remarks that caused Russo to feel unsafe, the Bank inappropriately gave the customer thirty days to close her account with the Bank rather than ending its relationship with the customer immediately. Russo resigned the day after this incident and alleges she was constructively discharged. She asserted claims for employment discrimination, retaliation, hostile work environment, and intentional infliction of emotional distress under applicable federal and state law. The Bank filed a motion for summary judgment on all claims. For the reasons that follow, the Bank's motion is granted.

## I.    BACKGROUND

Russo is an African American woman who was originally hired as the Assistant Head Teller of the Bank's Bryn Mawr branch location on October 20, 2014. (Def.'s Statement of Undisputed Material Facts [Def.'s SUMF] ¶¶ 1-2.) She was promoted to Head Teller of that branch

in January 2015 and then became the Head Teller of the Bank's primary branch location in February 2016. (*Id.* ¶¶ 3-4.)

### A. Issues with Therese Trainer

Starting in 2015, Russo's supervisor was Therese Trainer, who is white. (Compl. ¶ 10.) Russo claims that while working under Trainer, Trainer routinely made inappropriate and racist comments and "there was a clear difference in treatment between white employees and black employees." (Pl.'s Statement of Disputed Facts [Pl.'s SDF] ¶ 8.) For example, Russo testified that Trainer: made insensitive comments about Donald Trump's candidacy during the 2016 presidential election; stated that "black people don't know how to budget" and that if "they knew how to budget, then they would . . . be Republicans"; and remarked that she did not like Russo's winter boots, which Russo believed was racially motivated. (Def.'s SUMF ¶¶ 12, 14.) Trainer made several other comments regarding race, such as:

- Stating, in 2016, that she was "tired of black people complaining about slavery" and that "they forced Irish slave women to sleep with black slaves in order to create a stronger slave" (*Id.* ¶ 16; Pl.'s Statement of Disputed Facts in Opp. to Def.'s Statement of Undisputed Material Facts [Pl.'s SDF in Opp.] ¶ 16);
- During the 2016 Summer Olympics, suggesting to a Jamaican Bank employee that he should be able to move quickly because "Jamaicans are fast" (Def.'s SUMF ¶ 20; Pl.'s SDF in Opp. ¶ 20);
- Telling Russo that because she was "a big black woman," she should not be afraid of "a little old white lady" who was becoming angry with Russo in either 2016 or 2017 (Def.'s SUMF ¶ 23; Pl.'s SDF in Opp. ¶ 23);
- Inviting Russo to attend an anti-abortion meeting in March 2017 "because most aborted babies are aborted by black women" (Def.'s SUMF ¶ 25; Pl.'s SDF in Opp. ¶ 25); and
- Stating, in February 2018, that "she was tired of Black people complaining and acting like victims." (Def.'s SUMF ¶ 30; Pl.'s SDF in Opp. ¶ 30.)

Trainer also made it difficult for Russo to schedule a PTO day in February 2018. (Def.'s SUMF ¶¶ 32-34.)

On April 25, 2018 Trainer told Russo that she had to drive to another branch, pick up another Bank employee, and transport him with various coins. (*Id.* ¶ 48; Pl.'s SDF in Opp. ¶ 48.) Russo stated that she did not feel comfortable with this request and refused to do so. (Pl.'s SDF in Opp. ¶¶ 49, 51; Def.'s SUMF ¶¶ 49, 51.) On that same day, Trainer assigned origination credit for a customer's new credit card application to another teller, but Russo felt that it should have been attributed to her. (Def.'s SUMF ¶ 42.) Russo complained about this to Nicola Fryer (in HR), and when she learned "she would not get credit for the credit card sale, Russo left the branch, claiming she was not feeling well." (*Id.* ¶¶ 46-47; Pl.'s SDF in Opp. ¶¶ 46-47.) She did not return to work until April 30, 2018. (Def.'s SUMF ¶ 54.)

During February, March, and April 2018, Russo met with Fryer and Regional Manager Laura Biernacki to report Trainer's conduct and statements. (*Id.* ¶¶ 30, 35.)

### B.  Security Incident and Administrative Leave

On April 27, while Russo was away from the Bank, Assistant Manager Cathy Brown-Hinton discovered that a box containing combinations to the Bank's coin vault was taped shut rather than locked. (*Id.* ¶ 55; *see also* Def.'s Ex. 241.) The Bank opened an internal investigation into this incident. (Def.'s SUMF ¶ 60.) During the investigation, Shakeena Wilson, another teller, "reported that she and Russo had gone into the vault about a month before (i.e. in mid-April) and discovered that the key to the combination box was missing and the box was open, and together they taped the box shut." (*Id.* ¶ 61.) The investigation also revealed that Russo previously gave a new employee the keys to another teller's cash box.[1] (*Id.* ¶ 58; *see also* Def.'s Ex. 241.)

---

[1]  A few weeks later, Russo reported to HR (rather than the Bank's security team) that a separate key was left out in a bowl rather than placed in a key box. (Def.'s SUMF ¶¶ 67-68; Def.'s Ex. 240.) The Bank also investigated this and determined that there was no security issue with respect to this key because it did not open drawers or vaults containing cash. (Def.'s SUMF ¶ 70; Def.'s Ex. 240.)

On May 25, 2018, Biernacki and Fryer met with Russo to share the investigation's findings. (Def.'s SUMF ¶ 72.) Russo was placed on paid administrative leave following the meeting and her keys were confiscated before she left the branch. (*Id.* ¶¶ 75, 78.) Russo believes that, although it could be appropriate to take keys away from a suspended employee, she "was humiliated and denigrated in front of customers when she was required to turn over her keys." (Pl.'s SDF in Opp. ¶ 78; *see also* Def.'s SUMF ¶ 78; Pl.'s SDF ¶ 29.) She also acknowledged that taping the key box shut rather than locking it could warrant termination. (Def.'s SUMF ¶ 76; Pl.'s SDF in Opp. ¶ 76.)

Russo's leave was extended so the Bank's investigation team could review security footage of the vault, but the Bank was unable to recover the video. (Def.'s SUMF ¶ 75.) Although Russo notified the Bank that there was initially a discrepancy in her pay while she was suspended, she ultimately received her full pay. (*Id.* ¶ 87; Pl.'s SDF in Opp. ¶ 87.) Upon her return from leave, her pay was not reduced and her responsibilities were unchanged. (Def.'s SUMF ¶ 82; Pl.'s SDF in Opp. ¶ 82.) She nevertheless alleges that this entire incident "was a set up in retaliation for" making complaints about Trainer. (Pl.'s SDF ¶ 26.)

### C. **Russo's Formal Complaints and the Bank's Investigation**

On April 29, 2018—four days after Russo left the Bank because she was not feeling well— she filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Rights Commission ("PHRC"). (Def.'s SUMF ¶¶ 11, 46-47; Pl.'s SDF in Opp. ¶¶ 11, 46-47.) Her attorney later sent a letter dated May 16, 2018 to the Bank's Board detailing thirty alleged incidents of discrimination and harassment. (Def.'s SUMF ¶ 92; Pl.'s SDF in Opp. ¶ 92; Pl.'s SDF ¶ 7.) Among these were Trainer's comments related to slavery, Jamaicans running quickly, abortions, and the 2016 presidential election, as well as other instances of Trainer

criticizing and belittling Russo. (Def.'s SUMF ¶¶ 93-94; *see also* Russo Ex. 2.) For instance, the letter recounts Trainer requiring Russo to process her own referral paperwork, hypothetically asking Russo whether she has a brain, suggesting that Russo buy clothes at a thrift shop, telling Russo not to leave the building during her lunch break, and scolding Russo for failing "to plan for the unknown." (*See* Russo Ex. 2.)

The Bank investigated these allegations and sent Russo a copy of its findings on June 20, 2018. (Def.'s SUMF ¶¶ 95, 97; *see also* Def.'s Ex. 108.) The Bank explained that it "interview[ed] several individuals who [Russo] indicated specifically witnessed certain events, as well as Therese Trainer[,] who is the subject of [Russo's] complaint," but the Bank did "not conclude[] that discrimination or harassment occurred." (Def.'s Ex. 108.) However, the Bank "learned information about the day-to-day operations of the branch which [it] intend[ed] to address" by, for example, "reminding all employees about the anti-harassment policies of the Bank and providing additional training to managers and employees." (*Id.*)

### D. Russo's Return from Administrative Leave and Departure from the Bank

Upon Russo's return from administrative leave, HR Representative Jennifer Stryker met with Russo on June 22, 2018 to discuss her transition back to the branch. (Def.'s SUMF ¶ 101; Pl.'s SDF in Opp. ¶ 101.) Stryker also asked whether Russo was aware that the Bank received a call from a reporter regarding a local newspaper's investigation concerning Russo's allegations. (Def.'s SUMF ¶ 103; Pl.'s SDF in Opp. ¶ 103.) According to Russo, Stryker attempted to pressure Russo to tell the reporter not to write the article by saying it would be "bad" for Russo if the story were published. (Pl.'s SDF ¶ 24; Pl.'s SDF in Opp. ¶ 106.) The Bank maintains it did not try to discourage Russo from going forward with the article, which was eventually published. (Def.'s SUMF ¶¶ 105, 111.)

In June 2018, Trainer left the Bank's Bryn Mawr branch and was replaced by Cindy Yovanov. (Def.'s SUMF ¶¶ 100, 116; Pl.'s SDF in Opp. ¶¶ 100, 116.) Several months later, in February 2019, Russo told a co-worker that she was "planning [her] exit strategy" with her attorney so she could "be out by April at the latest." (Def.'s SUMF ¶ 114; *see also* Pl.'s SDF in Opp. ¶ 114.) She testified that she needed to leave her position at the Bank "[b]ecause it was affecting [her] health and [she] was stressed and [she] just didn't feel like [she] could take it any longer." (Def.'s SUMF ¶ 115 (quoting Russo Dep. at 126:14-18); *see also* Pl.'s SDF in Opp. ¶ 115.) Around the same time, Russo complained to Yovanov that she believed Yovanov was discriminating against her and retaliating against her in response to her filing a claim with the EEOC and PHRC by suggesting that Russo apply for a promotion in light of Russo's "repeated[]" resistance to "being pushed into another position and being referred to in the past tense in regards to [her] current position." (Def.'s Ex. 182; *see also* Def.'s SUMF ¶ 116; Pl.'s SDF in Opp. ¶ 116.) Yovanov was "confused and surprised" by this accusation and left it up to Russo to decide whether she wanted "to take advantage of the opportunity" for a promotion. (Def.'s Ex. 182.) Russo continued to oppose a promotion and remained in her role. (*Id.*)

On May 22, 2019, Russo emailed Yovanov, HR representatives, Biernacki, and the Bank's CEO regarding an interaction she had earlier that day with a hostile customer. (Def.'s SUMF ¶ 127; Pl.'s SDF in Opp. ¶ 127; Def.'s Ex. 209.) The customer, who Russo recognized from prior interactions, made inappropriate comments about abortion, race, and religion while Russo helped her at the drive-thru window. (Def.'s SUMF ¶¶ 128-30, 134; Pl.'s SDF in Opp. ¶¶ 128-30, 134; Def.'s Ex. 209.) Russo wrote that the customer was "clearly unstable" and the customer "offended" her. (Def.'s SUMF ¶¶ 129-30; Pl.'s SDF in Opp. ¶¶ 129-30; Def.'s Ex. 209.) She stated she would

refuse to help the customer in the future and demanded the Bank act in response to this incident. (Def.'s SUMF ¶ 130; Pl.'s SDF in Opp. ¶ 130; Def.'s Ex. 209.)

Within an hour, the Bank's Chief HR Officer, Linda Sanchez, reached out to Russo and the two met in person later that day with another HR Representative, Corey Crapella. (Def.'s SUMF ¶¶ 131-32; Pl.'s SDF in Opp. ¶¶ 131-32; Def.'s Ex. 209.) Russo recounted the incident to Sanchez and Crapella, who told Russo they would follow up with her within a day or two. (Def.'s SUMF ¶¶ 133-35; Pl.'s SDF in Opp. ¶¶ 133-35.) The next day, Sanchez and Crapella met with Russo and informed her that they spoke to the customer, who corroborated Russo's account of the events. (Def.'s SUMF ¶¶ 137-38; Pl.'s SDF in Opp. ¶¶ 137-38; Def.'s Ex. 211.) Sanchez stated that based on this incident, the Bank decided to end its relationship with the customer (or "de-market" the customer). (Def.'s SUMF ¶ 139; Pl.'s SDF in Opp. ¶ 139; Def.'s Ex. 211.) Pursuant to the Bank's standard de-marketing policy, the customer would be afforded thirty days before her account was officially closed so she could find a new financial institution, transfer her funds, update account information for any direct deposits and automatic withdrawals, and perform other tasks to prepare for the termination of her relationship with the Bank. (Def.'s SUMF ¶¶ 139-41; Def.'s Ex. 211.) Finally, Sanchez explained that if the customer returned to the branch, Russo did not need to assist her. (Def.'s SUMF ¶ 139; Pl.'s SDF in Opp. ¶ 139; Def.'s Ex. 211.)

At some point after that meeting ended, Russo handed her badge and keys to Yovanov and resigned from the Bank. (Def.'s SUMF ¶ 146.) In an email she sent to HR and Yovanov later that night, Russo explained that she resigned because the Bank did not immediately terminate its relationship with the customer. (Def.'s SUMF ¶ 147; Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.) She felt that the Bank created "a situation where [the customer] can return to further harass [her] and remind [her] of what has transpired." (Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.) She

"consider[ed] this constructive discharge as a result of the Bank's repeated failure to protect [her] and recognize [her] rights." (Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.)

### E.  Procedural History

As noted above, Russo filed a complaint with the EEOC and PHRC on April 29, 2018. (Def.'s SUMF ¶ 11; Pl.'s SDF in Opp. ¶ 11.) The EEOC issued a Right to Sue Letter on March 7, 2019 and a supplementary letter with respect to her constructive discharge allegations on May 30, 2019. (Compl. ¶ 9.) This lawsuit was filed within 90 days of the Right to Sue Letters and is therefore timely. (*Id.*)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the non-moving party may demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

8

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   DISCUSSION

Russo sued the Bank for racial discrimination, retaliation, hostile work environment, and intentional infliction of emotional distress. The Bank seeks summary judgment on all counts. Because Russo failed to proffer sufficient evidence on which a jury could reasonably find for her on any of her claims, the Court grants the Bank's motion in full.

### A.   Racial Discrimination

Russo's racial discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework.[2] "To establish a *prima facie* case, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she suffered a materially adverse employment action; and (4) the circumstances of the adverse employment action support an inference of discrimination." *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114, 125 (E.D. Pa. 2022) (citing *Whitmore v. Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020)) (italicization added). If a plaintiff establishes a *prima facie* case, the employer must offer legitimate, non-discriminatory reasons for the adverse employment action. *See Fuentes*

---

[2]   Russo asserts racial discrimination claims under 42 U.S.C. § 1981, Title VII, and the Pennsylvania Human Relations Act (PHRA). The same burden-shifting framework applies to claims brought under each statute. *See Blakney v. City of Phila.*, 559 F. App'x 183, 187 (3d Cir. 2014); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020).

*v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

If the employer provides non-discriminatory reasons for its actions, the plaintiff must then prove that the employer's "explanation is merely a pretext for the discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). The plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). In doing so, the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

The parties do not dispute that Russo is a member of a protected class and the Court will assume she was qualified for the position she held. Russo asserts two distinct adverse employment actions that could serve as the basis of her discrimination claim: suspension with pay and constructive discharge. The Court assesses each of these in turn.

### i.  Suspension with Pay

The Bank argues that it is entitled to summary judgment because Russo did not suffer a materially adverse employment action. (Def.'s Mem. of Law in Support of its Mot. for Summ. J. [Def.'s Mem.] at 9-10.) Specifically, although Russo was placed on paid administrative leave in

connection with the Bank's investigation into the unlocked combination box, paid administrative leave is not a materially adverse employment action. (*Id.*) The Court agrees.

An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). In *Jones*, the Third Circuit joined the "chorus" of other courts of appeals that have concluded that "[a] paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision." *Id.* As the Third Circuit explained, this is because "[a] paid suspension is neither a refusal to hire nor a termination, and by design it does not change compensation. Nor does it effect a 'serious and tangible' alteration of the 'terms, conditions, or privileges of employment,' . . . because 'the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances.'" *Id.* (quoting *Storey*, 390 F.3d at 764 and *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006)). It therefore held "that a suspension with pay, 'without more,' is not an adverse employment action under the substantive provision of Title VII." *Id.* (quoting *Joseph*, 465 F.3d at 91).

Where a plaintiff can show something "more," however, suspension with pay may constitute an adverse employment action. *Id.* For example, a plaintiff who "was required to undergo a medical evaluation" and "was required to sign a PIP without a union representative" established that her paid leave was an adverse employment action. *Thourot v. Monroe Career & Tech. Inst.*, No. 14-1779, 2016 WL 6082238, at *5 (M.D. Pa. Oct. 17, 2016). Similarly, an employer's failure to provide a justification for placing an employee on paid leave may render paid

leave an adverse employment action. *See Vay v. Huston*, No. 14-769, 2016 WL 7324596, at *13 (W.D. Pa. Dec. 16, 2016).

In this case, however, Russo has not shown that her suspension with pay contained something "more" such that it could be an adverse employment action. *Jones*, 796 F.3d at 326. The record establishes that Russo was suspended in connection with the Bank's investigation into possible improper conduct related to security protocols and she was fully compensated during her suspension. (Def.'s SUMF ¶¶ 75, 82, 87.) *Jones* therefore controls and Russo cannot maintain a discrimination claim based on her paid suspension.

### ii.  <u>Constructive Discharge</u>

Alternatively, Russo asserts her purported constructive discharge constitutes an adverse employment action. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). To establish that she was constructively discharged, Russo must show that the Bank "knowingly permitted discriminatory employment conditions 'so intolerable' that a 'reasonable person subject to them would have to resign.'" *Heredia-Caines*, 580 F. Supp. 3d at 128 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996)). This is an objective inquiry "that focuses not on how the plaintiff experienced her work environment but on how a reasonable person would have." *Id.*; *see also Hibbard v. Penn-Trafford Sch. Dist.*, No. 13-622, 2014 WL 640253, at *8 (W.D. Pa. Feb. 19, 2014) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir. 1992)) (plaintiff must show that employer's conduct made "working conditions so unpleasant or intolerable that a reasonable person in the employee's shoes would resign"). Accordingly, "[a]n employee's reliance on the subjective impact of the employer's actions will not suffice, as 'the law

does not permit an employee's subjective perceptions to govern a claim of constructive discharge.'" *Hibbard*, 2014 WL 640253, at *8 (quoting *Gray*, 957 F.2d at 1082). To determine if an employee was forced to resign, courts may consider various factors, "including whether (1) she was threatened with discharge; (2) she was encouraged to resign; (3) she was demoted or suffered a reduction in pay or benefits; (4) she was involuntarily transferred to a less desirable position; (5) her job responsibilities were altered; and (6) she began receiving unsatisfactory job evaluations." *Seeney v. Elwyn, Inc.*, 409 F. App'x 570, 573 (3d Cir. 2011).

Russo has not provided any evidence suggesting that any of these factors contributed to her constructive discharge. *See Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 777 (3d Cir. 2009); *Heredia-Caines*, 580 F. Supp. 3d at 128. Although "[t]he absence of the factors . . . is not necessarily dispositive," Russo fails to point to other facts and circumstances that establish that she was constructively discharged. *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168 (3d Cir. 2001); *see also Seeney*, 409 F. App'x at 574. The record clearly shows that Russo resigned because she was upset that the Bank provided a customer thirty days to end her relationship with the Bank rather than terminating that relationship immediately. (Def.'s SUMF ¶¶ 146-47; Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.) Even if Russo is correct that it is technically possible to close a customer's account at the Bank immediately (*see* Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Pl.'s Opp.] at 9; Pl.'s SDF in Opp. ¶ 140), as explained further below, the Bank was merely applying its standard de-marketing policy to this customer. Russo may have "subjectively perceived" the Bank handled this incident in an "objectionable" manner. *Hibbard*, 2014 WL 640253, at *8. But a reasonable employee would not have found the resulting working conditions—the possibility that an offensive customer might return to the branch—so "unendurable" that they had no choice but to resign. *Suders*, 542 U.S. at 141; *see also Hibbard*,

2014 WL 640253, at *9. Stated differently, Russo's job may have been "more stressful" because of the Bank's conduct, but it did not become "objectively intolerable" or "unbearable."[3] *Duffy*, 265 F.3d at 169; *see also Heredia-Caines*, 580 F. Supp. 3d at 129 ("[T]he severity of Plaintiff's subjective experience of her work environment cannot make up for her lack of admissible evidence of objectively intolerable work conditions.").

Even assuming Russo was constructively discharged, Russo still fails to establish a *prima facie* case because the circumstances of her constructive discharge do not support an inference of discrimination. *See Jones*, 796 F.3d at 327 (affirming summary judgment in favor of defendant where plaintiff failed to show "some causal nexus" between her protected status and defendant's adverse treatment) (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003)). Russo resigned because she was upset that a hostile customer was given thirty days to leave the Bank. (Def.'s SUMF ¶¶ 146-47; Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.) Russo views the Bank's decision as one meant to harass her because the customer could return to the branch and offend her again. (Pl.'s SDF in Opp. ¶ 147; Def.'s Ex. 212.). In her view, the Bank could have and should have immediately terminated its relationship with the customer. (Pl.'s Opp. at 9.) Russo emphasizes that the letter sent to the customer states that the Bank gave the customer thirty days

---

[3]     Russo also fails to establish that she was constructively discharged because she has not shown that she was subject to a hostile working environment, as explained in Section III.C. *See Heredia-Caines*, 580 F. Supp. 3d at 128 ("Discrimination must be more severe or pervasive to establish a claim for constructive discharge than it need be to establish a claim for hostile work environment.") (citing *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006)). Moreover, by the time Russo resigned, Trainer had not supervised or worked with Russo for nearly a year. Other than construing Yovanov's suggestion that Russo apply for a promotion as discriminatory, Russo does not complain of any discriminatory conduct during the several months leading up to her purported constructive discharge, which significantly undermines her claim. *See id.* at *8-9 (rejecting constructive discharge claim where allegedly discriminatory supervisor transferred departments six months prior to plaintiff's resignation and plaintiff did not produce evidence supporting allegations of discrimination or retaliation occurring in the several months prior to resigning).

to close her accounts "[a]s a courtesy." (*Id.* (quoting Def.'s Ex. 280).) She argues this shows that the Bank could have closed the customer's accounts immediately, without this courtesy, but chose not to do so. (*Id.*; Pl.'s SDF in Opp. ¶ 140.) But she fails to show how affording the customer time to close her accounts supports an inference of racial discrimination. *See Dykes v. Marco Grp., Inc.*, 222 F. Supp. 3d 418, 428-29 (E.D. Pa. 2016).

Furthermore, the Bank has provided a legitimate reason for its conduct: it was applying its standard de-marketing policy. (Def.'s Mem. at 12.) Although the de-marketing letter sent to the customer states that the Bank was providing her with thirty days to close her accounts "[a]s a courtesy," this is form language found in a template used in other instances of de-marketing that reflects the Bank's standard policy. (*Id.*; *see also* Def.'s Exs. 280-81; Sanchez Dep. at 81:1-7 (explaining that "the standard procedure for demarketing a customer is to give the customer 30 days to transfer their accounts").) Contrary to Russo's argument, the natural reading of this language in no way reflects a conscious, affirmative decision by the Bank to be particularly generous towards this customer and give her more time to transition to a new financial institution than any other customer would have had. (*See* Pl.'s Opp. at 9.) In fact, rather than dragging its heels, the Bank acted swiftly once Russo raised concerns regarding this customer. The Bank immediately investigated this incident and decided to end its relationship with this customer within 24 hours. (Def.'s SUMF ¶¶ 131-41; Def.'s Exs. 209-11.) Thus, the Bank has proffered a non-discriminatory explanation for its conduct. *See Bazargani v. Haverford State Hosp.*, 90 F. Supp. 2d 643, 650 (E.D. Pa. 2000) (finding application of employer's standard policy a "legitimate, non-discriminatory reason" for challenged conduct); *see also In re Tribune Media Co.*, No. 16-226, 2017 WL 2622743, at *9-10 (D. Del. June 16, 2017) (same).

Russo fails to rebut this explanation as pretextual and therefore cannot maintain a claim that her alleged constructive discharge was the product of discrimination. *See West v. Hudson Cnty. Corr. Ctr.*, 231 F. App'x 136, 139 (3d Cir. 2007) (affirming summary judgment for defendant on race discrimination claims where plaintiff failed to rebut defendant's claim that its conduct was the result of application of standard policies).

The Bank's motion for summary judgment with respect to Russo's discrimination claims is therefore granted.

**B.  Retaliation**

Russo's retaliation claims under Title VII and the PHRA are also subject to the *McDonnell Douglas* framework. *See Anderson v. Boeing Co.*, 694 F. App'x 84, 85-86 (3d Cir. 2017). To establish a *prima facie* case of retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). In the retaliation context, an adverse employment action must be "materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). To assess whether protected activity and retaliatory conduct are causally connected, a court may analyze "the temporal proximity between the two if 'unusually suggestive,'" or in the alternative, "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a

retaliatory animus when taking the adverse action." *Id.* at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

Once a plaintiff has established a *prima facie* case, the employer must provide "'a legitimate, non-retaliatory reason' for its conduct." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)). The plaintiff may rebut this explanation by showing the employer's reasons for its conduct are pretextual. *Id.* "[T]he plaintiff must produce 'sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action.'" *Krouse*, 126 F.3d at 504 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)). To cast enough doubt onto the employer's proffered reasons, a plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Whitmore*, 510 F. Supp. 3d at 309 (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007)).

Russo asserts several purported retaliatory actions the Bank took after she complained about Trainer to Fryer and Biernacki and she filed her formal complaints with the EEOC and PHRC in April 2018.[4] Russo argues that the unlocked "vault/key box accusation . . . was a set up in retaliation for [her] racial complaints." (Pl.'s Opp. at 7; *see also id.* at 6, 24; Pl.'s SDF ¶ 26.) She also claims that the Bank retaliated against her when she was allegedly pressured to stop the newspaper story regarding the Bank from going forward and when the Bank did "not protect[]

---

[4]      "For purposes of the first prong of a *prima facie* case of retaliation, protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaints to management.'" *Daniels*, 776 F.3d at 193 (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).

[her] and purposefully g[ave] the offending customer the courtesy of thirty days instead of an immediate demarketing." (Pl.'s Opp. at 24.)

With respect to Russo's first argument, the record disputes her contention that the investigation into the unlocked box "was a set up" in response to her protected conduct. (*Id.* at 7.) Brown-Hinton discovered that the combination box was unlocked on April 27, but Russo did not file her EEOC complaint until two days later. (Def.'s SUMF ¶ 55; *see also* Def.'s Ex. 241.) The investigation therefore cannot be considered an adverse employment action for retaliation purposes. *See Daniels*, 776 F.3d at 196 (rejecting retaliation claim based on purported adverse employment action that "preceded [plaintiff's] first protected activity"). Although Russo raised complaints about Trainer prior to this, nothing in the record suggests that Brown-Hinton was aware of those complaints or had any motive to retaliate against Russo for doing so. *See id.* (noting that plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted"). Furthermore, during the Bank's investigation into the facts and circumstances surrounding the unlocked box, Wilson implicated herself in potential misconduct by admitting that she and Russo taped the box shut. (Def.'s SUMF ¶ 61; Def.'s Ex. 241.) Finally, the Bank also learned that Russo gave a new employee a set of keys that belonged to a different teller through the investigation. (Def.'s SUMF ¶ 58; Def.'s Ex. 241.) Even assuming Russo's resultant paid suspension could serve as an adverse employment action,[5] the Bank's decision to place Russo on paid leave was supported by a legitimate, non-retaliatory explanation that Russo has failed to rebut.

---

[5]    The Bank again relies on *Jones* and argues that Russo's paid suspension cannot constitute an adverse employment action for purposes of her retaliation claims. (Def.'s Mem. at 15.) However, in *Jones*, the Third Circuit did "not consider" or "decide whether a paid suspension constitutes an adverse action in the retaliation context." *Jones*, 796 F.3d at 325. This Court need not do so, either.

Nor can Russo assert a retaliation claim based on purported threats that "things would be bad" if she did not stop the newspaper article from being published. (Pl.'s Opp. at 24; Pl.'s SDF ¶ 25.). "Words alone, even when harsh, do not constitute an adverse action if they are unaccompanied by follow up discipline or other negative action." *Raffaele v. Potter*, No. 09-3622, 2012 WL 33035, at *9 (E.D. Pa. Jan. 6, 2012) (collecting cases). Russo has not shown that the Bank acted unfavorably toward her in any way after this meeting or that this alleged threat had any impact on her employment. This is therefore not a materially adverse action for purposes of a retaliation claim. *See Hudson v. Cheyney Univ. of Pa.*, No. 14-2552, 2018 WL 6603870, at *7 (E.D. Pa. Dec. 14, 2018) (rejecting "the threat of termination" as "an adverse employment action because no punitive action was taken against plaintiff"); *Nolan v. Swartz Campbell, LLC*, No. 05-1508, 2008 WL 598291, at *20 (W.D. Pa. Feb. 29, 2008) (finding conversation where superior told plaintiff that her "colleagues resented her" and suggested she drop a lawsuit and/or resign insufficient to support retaliation claim where it was not "attached to or . . . connected with" materially adverse action because "merely experiencing some apprehension and subjectively feeling intimidated from such a conversation hardly amounts to the type [of] measures that the courts have found sufficient to support a claim of retaliation"); *Pugni v. Reader's Digest Ass'n, Inc.*, No. 05-8026, 2007 WL 1087183, at *23 (S.D.N.Y. Apr. 9, 2007) (finding "alleged 'threat' that plaintiff's days" were "numbered" was not "a materially adverse action" for retaliation claim).

Similarly, the Bank's decision to de-market a customer and give her thirty days to close her accounts is not an adverse employment action for purposes of establishing a *prima facie* case. However, even if this could serve as the basis of a retaliation claim, Russo is unable to establish a causal connection between the Bank's decision and her protected activity given that they occurred over a year apart. *See Rhoden v. Children's Hosp. of Pittsburgh of UPMC Health Sys.*, 749 F.

App'x 86, 89-90 (3d Cir. 2018) (affirming summary judgment where plaintiff "cannot show a causal link between her filing of an EEOC complaint in October 2012 and" the employer's alleged adverse employment action in October 2013); *see also Daniels*, 776 F.3d at 198 (ten months insufficient to establish causal connection). And Russo fails to "present[] any other evidence that suggests" the Bank gave the customer 30 days to close her accounts in response to Russo's protected conduct. *See Rhoden*, 749 F. App'x at 90; *see also Daniels*, 776 F.3d at 198. Finally, as noted above, the Bank applied a standard policy when it de-marketed this customer, which Russo failed to show was pretextual.[6] *See supra* Section III.A.ii.

The Bank is therefore entitled to summary judgment on Russo's retaliation claims.

### C. Hostile Work Environment

"To establish a hostile work environment claim," Russo must show: "(1) that she suffered intentional discrimination because of her race . . . ; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances[;] and (5) the existence of *respondeat superior* liability."[7] *Davis*, 2022 WL 970842, at *5 (citing *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 310 (3d Cir. 2018)). A hostile work environment exists when a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or

---

[6]     Although not mentioned in her brief, Russo also implicitly argues that any of the following could be retaliatory actions: Trainer assigning credit for a new account to another teller (Def.'s SUMF ¶ 42; Pl.'s SDF in Opp. ¶ 42); Trainer asking her to drive to another branch to pick up an employee and transport coins back to her branch (Def.'s SUMF ¶ 50; Pl.'s SDF in Opp. ¶ 50); and Yovanov suggesting she apply for a promotion (Def.'s SUMF ¶ 116; Pl.'s SDF in Opp. ¶ 116). These do not rise to the level of materially adverse retaliatory actions.

[7]     Russo's hostile work environment claims under Title VII and the PHRA "are subject to the same legal standard, so the Court will analyze them together." *Davis v. Elwyn, Inc.*, No. 20-5798, 2022 WL 970842, at *5 (E.D. Pa. Mar. 31, 2022) (citing *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006)).

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To determine whether such an environment exists, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (quoting *Harris*, 510 U.S. at 23).

### i.   Applicable Limitations Periods under Title VII and the PHRA

Prior to asserting claims under Title VII and the PHRA in federal court, plaintiffs in Pennsylvania must exhaust administrative remedies with both the EEOC and the PHRC. *See Mandel*, 706 F.3d at 163. Title VII provides that charges of discrimination "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). However, if the charges are also filed "with a State or local agency with authority to grant or seek relief from such practice," such as the PHRA, then the limitations period is enlarged to "within three hundred days after the alleged unlawful employment practice occurred." *Id.*; *see also Drake v. Steamfitters Local Union No. 420*, No. 01-6968, 2005 WL 196444, at *6 (E.D. Pa. Jan. 27, 2005). Although the PHRA, like Title VII, requires filing a charge of discrimination within 180 days, it does not contain an analogous enlargement provision. *See Brown v. Tait Towers Mfg., LLC*, No. 21-4573, 2022 WL 206177, at *4 (E.D. Pa. Jan. 21, 2022). In effect, this means that the limitations period for a plaintiff's Title VII claims can be greater than the limitations period for her PHRA claims. *See Mandel*, 706 F.3d at 164-65 (agreeing with district

court's application of different statutes of limitations for Title VII and PHRA claims); *Brown*, 2022 WL 206177, at *3-4. Such is the case here.

Russo "filed a charge of discrimination with the EEOC and PHRC" on April 29, 2018. (Def.'s SUMF ¶ 11; Pl.'s SDF in Opp. ¶ 11.) Accordingly, conduct is actionable in this lawsuit only if it occurred after July 3, 2017 (under Title VII) or after October 31, 2017 (under the PHRA). *See Brown*, 2022 WL 206177, at *4.

### ii.  The Continuing Violation Doctrine

The continuing violation doctrine provides an exception to these statutes of limitations by allowing a plaintiff to aggregate "discriminatory acts that are not individually actionable . . . to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" *Mandel*, 706 F.3d at 165 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). To invoke the continuing violation doctrine, "the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Id.* at 165-66 (citing *Morgan*, 536 U.S. at 122). Therefore, "the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment" for a claim to be timely. *Morgan*, 536 U.S. at 118.

In contrast, "discrete acts, which are individually actionable," such as "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation," cannot be aggregated. *O'Connor*, 440 F.3d at 127. For these "discrete acts," "the limitations period runs from the act." *Id.*

### iii.  **Russo's Hostile Work Environment Claim**

Given the statutes of limitations that apply to Russo's claims, the only conduct that could serve as the basis for establishing she suffered from a hostile work environment is Trainer's statement that "she was tired of Black people complaining and acting like victims" in February 2018.[8] (Def.'s SUMF ¶ 30; Pl.'s SDF in Opp. ¶ 30.) But "Title VII is not violated by the '[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' or by mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment." *Lawrence v. F.C. Kerbeck & Sons*, 134 F. App'x 570, 572 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). Nor does "a lack of racial sensitivity . . . alone, amount to actionable harassment." *Faragher*, 524 U.S. at 787. Trainer's statement is a "mere offensive utterance" that is insufficient to establish that the Bank was "permeated" with discrimination or that Russo faced "severe or pervasive" discrimination necessary for her hostile work environment claim. *Lawrence*, 134 F. App'x at 572; *see also Dykes*, 222 F. Supp. 3d at 430-31 (quoting *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 174 (3d Cir. 2014)) (finding two "unwelcome and personally offensive" comments insufficient to constitute "'severe and pervasive conduct necessary to constitute a hostile work environment'"); *Huggins v. Coatesville Area Sch. Dist.*, Nos. 07-4917, 09-1309, 2010 WL 4273317, at *6 (E.D. Pa. Oct. 29, 2010) (finding two inappropriate racial comments insufficient "to have altered the terms and conditions" of employment for purposes of a hostile work environment claim).

---

[8]     For purposes of this motion, the Court assumes that this occurred. As the Bank explains, however, the only reference to this statement in the record appears in Russo's deposition testimony and this incident does not appear in the letter Russo's lawyer sent the Bank only a few months after this purportedly occurred. (*See* Def.'s Mem. at 18-19; *see also* Def.'s SUMF ¶¶ 92-93; Pl.'s SDF in Opp. ¶¶ 92-93; Russo Ex. 2.)

Even if the Court were to use this statement as the basis for a continuing violation theory and consider the time-barred conduct Russo identified, Russo's claim still fails to survive the Bank's motion for summary judgment. *See Reid v. Sleepy's, LLC*, No. 14-2006, 2016 WL 3345521, at *11-13 (M.D. Pa. June 16, 2016) (granting summary judgment on hostile work environment claim relying on continuing violation theory because, even considered collectively, "the alleged harassment was [not] severe or pervasive enough to constitute a hostile work environment"). Russo identified several inappropriate statements related to race that Trainer made over the course of roughly two years as well as other conduct she found objectionable.[9] Although undoubtedly offensive, problematic, and misplaced, even taken as a whole, these acts do not rise to the level of being sufficiently severe or pervasive to establish a *prima facie* case of a hostile work environment. *See Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010) (affirming summary judgment for defendant on hostile work environment claim because use of "unpalatable and inappropriate" racial epithets was not "pervasive and severe"); *Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 75-77 (3d Cir. 2003) (finding derogatory comment referring to "culture" of African American employees, manager's statement that he was "going to sit at [African American employees'] desks with a whip," placing minority employees' desks "directly in front of their white supervisor's office windows," excluding plaintiff from a meeting, turning away from plaintiff to "snub" her, and screaming at plaintiff insufficiently "severe and pervasive" to establish hostile work environment). Trainer's comments were "not particularly frequent" and were "not physically threatening or humiliating." *Brooks*, 342 F. App'x at 777; *see also Sherrod*, 57 F. App'x at 77. Russo no doubt felt "uncomfortable" as a result. *Laye v. Potter*, No. 04-0046,

---

[9]     Russo's paid administrative leave and resignation are "discrete acts" that cannot be aggregated with other conduct for purposes of this analysis. *See O'Connor*, 440 F.3d at 127.

2006 WL 1617777, at *6 (W.D. Pa. June 2, 2006). But these statements were not severe or pervasive enough to alter the terms and conditions of Russo's employment. *See Woodard v. PHB Die Casting*, 255 F. App'x 608, 609-10 (3d Cir. 2007) (affirming summary judgment on hostile work environment claim because African American plaintiff being "asked questions using the phrase 'you people'" and whether "he intended to complete a drug deal during a bathroom break" "are the type of offhand comments that are insufficient to support a hostile work environment claim"); *Blake v. Penn State Univ. Greater Allegheny Campus*, No. 09-1182, 2011 WL 841374, at *11 (W.D. Pa. Mar. 8, 2011) (granting summary judgment where use of "racially derogatory terms" did "not rise to the level of severe and pervasive required to support a hostile work environment claim"); *Eric v. Donsco Inc.*, No. 09-1052, 2010 WL 5018574, at *6 (M.D. Pa. Oct. 12, 2010) (finding several incidents of "name-calling" with "racial animus" insufficient "to establish that Plaintiff was subjected to regular and pervasive harassment based upon race"), *report and recommendation adopted*, 2010 WL 5014292 (M.D. Pa. Dec. 3, 2010); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607, 611 (E.D. Pa. 2001) (granting summary judgment on hostile work environment claim where supervisor "made a number of racist remarks, including referring to the black community as a baby factory, stating that blacks are incapable of thinking analytically, and warning Plaintiff not to talk to white women" because comments were not "extreme" enough "to constitute a 'change in terms and conditions of employment'") (quoting *Faragher*, 524 U.S. at 788).

Finally, other conduct Russo complains of, such as having trouble scheduling a PTO day, being told to drive to another branch, not receiving origination credit for a new account, and being told not to leave the premises during her lunch break, are the sorts of frustrating tensions between an employee and her supervisor that are inherent in the workplace. *See Charles v. Mott's LLP*, No.

17-2879, 2018 WL 2002794, at *4 (D.N.J. Apr. 30, 2018). These were "neither physically threatening nor humiliating and would not reasonably interfere with work performance" and cannot be used to establish a hostile work environment claim. *Eric*, 2010 WL 5018574, at *6.

The Bank's motion is therefore granted.

### D.  Intentional Infliction of Emotional Distress

Russo also asserts a claim of intentional infliction of emotional distress. The Bank argues that the Pennsylvania Workman Compensation Act preempts this claim. (Def.'s Mem. at 22.) Russo "does not contest Defendant's Motion for Summary Judgment as to" this claim. (Pl.'s Opp. at 12 n.5.) Accordingly, the Court will grant summary judgment in favor of the Bank on this claim.

## IV.  CONCLUSION

For the reasons discussed above, the Court grants the Bank's motion for summary judgment as to all claims. To be clear, the Court does not discredit Russo's feelings of offense, anger, or frustration, as the conduct at issue in this case is entirely unprofessional. But employment law is not a civility code and Russo has failed to put forth sufficient facts to defeat the Bank's motion for summary judgment. Despite this, the Court's decision should not be interpreted as condoning the Bank's or its employees' actions.

An Order consistent with this Memorandum will be docketed separately.